**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-1250**

JOSHUA L. BARRICKS,

Plaintiff - Appellee,

v.

JAMES R. WRIGHT,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Elizabeth K. Dillon, Chief District Judge.  (7:23-cv-00551-EKD-CKM)

Argued:  January 27, 2026                        Decided:  March 3, 2026

Before WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

**ARGUED:**  Joshua D. Goad, JOHNSON AYERS & MATTHEWS, PLC, Roanoke, Virginia, for Appellant.  David Robert Berry, GENTRY LOCKE, Roanoke, Virginia, for Appellee.  **ON BRIEF:**  Monica T. Monday, GENTRY LOCKE, Roanoke, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

In arresting Joshua Barricks for skateboarding on a public road and for possible public intoxication in Alleghany County, Virginia, Sheriff's Deputy James Wright used force that resulted in serious injuries to Barricks. Deputy Wright maintains that he used "only an amount of force reasonably necessary to effect the arrest," while Barricks argues that Wright used excessive force when he punched Barricks twelve times in the face while arresting him. After Barricks was arrested, he was taken to the hospital, as he had sustained a facial laceration, facial bruising and swelling, and bruising on the knees. Imaging revealed that Barricks also suffered a right frontal 6 mm intracerebral hemorrhage, closed fracture of the right orbital rim, blood in the maxillary sinus, and several fractures to two different parts of his jawbone.

Barricks commenced this action against Deputy Wright for excessive force, in violation of the Fourth Amendment, as well as for common law battery.

Deputy Wright filed a motion for summary judgment, alleging that the force he used was not excessive but was only that necessary to arrest Barricks, who had fled and resisted arrest. Moreover, Deputy Wright claimed that he was entitled to qualified immunity because he did not violate a clearly established constitutional right and a reasonable officer in his position "could have believed his actions were justified."

The district court, after assessing the record, which included bodycam video, found that the relevant facts were disputed such that, if the jury were to find in Barricks's favor on the factual disputes, the law was clearly established that Wright's use of force would be excessive.

2

From the district court's order denying his summary judgment motion, Deputy Wright filed this appeal, relying for jurisdiction on *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019), which held that a "district court's denial of summary judgment on the basis of qualified immunity is a collateral order and therefore subject to immediate appellate review, despite being interlocutory." Barricks, on the other hand, contends that Deputy Wright "may not challenge [the district court's] determination of what facts are disputed or protest the inferences drawn from those facts," citing *Culosi v. Bullock*, 596 F.3d 195, 201–03 (4th Cir. 2010). As he argues, fact-related disputes fall outside our limited jurisdiction on interlocutory appeal, citing *Hicks v. Ferreyra*, 965 F.3d 302, 312–13 (4th Cir. 2020).

While we have no jurisdiction to review the district court's conclusion that there are disputes of material fact and that resolution of those disputes is necessary to determine qualified immunity, we can review the district court's denial of qualified immunity as a matter of law in the context of the facts taken most favorably to Barricks. When considering the facts of record in that light, we affirm.

I

The facts of record on which the district court relied to conclude that there was a dispute of material facts are as follows.

At about 9:40 p.m. on March 30, 2022, Deputy Wright was driving his marked Sheriff's Department vehicle on Alleghany Avenue in Covington, Virginia, when he saw Barricks skateboarding on the road, headed in the opposite direction. Deputy Wright, who

3

was on the phone with his then-girlfriend and coworker, said, "This motherf-cker's skateboarding down the Godd-mn road." Deputy Wright turned his vehicle around and followed Barricks to the front of the Farm & Fuel Service Center, a local convenience and supply store, where he confronted Barricks. As Deputy Wright spoke to Barricks, he became suspicious that Barricks might be high on drugs. Barricks denied that suggestion, directing Deputy Wright to the cashier who, Barricks said, could attest that he had been playing slots all day. As Deputy Wright seemed to take action to grab Barricks, Barricks jerked away and shouted, "Man, that's bullsh-t dude. Go ahead and shoot me!" He then ran away inside the store.

Barricks fled to a back room where seed and other farm equipment was stored, but he could not exit from that room, as the rear door to the outside was locked. As Deputy Wright gave chase and arrived in the room, Barricks stuck his hands up and dropped to his knees just before Wright yelled at Barricks to stop and get on the ground. Barricks then put his hands on the back of his head, telling Deputy Wright that he was already on the ground. At that point, the events become unclear and disputed. Moreover, the parties differ on their interpretation of Deputy Wright's bodycam video.

While Barricks testified that he remembers nothing after he got on his knees until he later woke up in the hospital, Deputy Wright testified that Barricks resisted arrest. From the video, it is clear that Deputy Wright pushed Barricks's face into the floor, and while Wright was seeking to pull one of Barricks's wrists free from under him to handcuff him, Barricks seemed to be resisting. Deputy Wright then used what he referred to as "distraction strikes," which he explained were strikes that he was taught to use to disorient

4

and confuse a nonsurrendering subject. The strikes were to be made with the palm or side of the hand. Barricks contends that he was surrendering, such that the strikes were unnecessary and that the video, in any event, shows that Deputy Wright was using his knuckles — not his palm or side of his hand — to inflict the strikes. Barricks also contends that the video shows that during Deputy Wright's effort to effect the arrest, he "hardly moved" and only emitted sounds of moaning and groaning. At one point during the video, Barricks yelled, "Please, stop!"

Deputy Wright was eventually able to handcuff Barricks, and after doing so, he found a bag on the floor of what he believed to be methamphetamine. And shortly thereafter, when other officers arrived and searched Barricks, they found a pocketknife.

After completing the arrest, Deputy Wright spoke with his then-girlfriend, who had also arrived on the scene, and told her, "I'm fine. Other than blood bein' all over me." She asked, "What'd you do to 'em?" He responded, "f-cked his face up." Deputy Wright also texted another coworker later, who asked Wright, "Was [Barricks] the dude you jacked up[?]" Deputy Wright responded, "Yea," referring to an earlier law enforcement encounter between him and Barricks.

After reviewing these facts and the bodycam video, the district court identified several disputed facts at the crux of the qualified immunity analysis, including (1) to what extent Barricks posed a threat to Deputy Wright; (2) whether Wright pushed Barricks to the ground after he had surrendered; (3) whether Wright used his knuckles to strike Barricks's face; (4) whether and to what extent Barricks resisted after hitting the ground; and (5) whether parts of his body, other than his head, were readily available targets for

5

"distraction strikes." The court noted that if the disputed facts were viewed in the light most favorable to Barricks, they would show that he had stopped resisting and no longer posed a threat when he got on his knees and put his hands behind his back, only to then have Deputy Wright slam him to the ground and punch him twelve times in the face. If a jury were to make these factual findings, the court concluded, the law was clearly established that Deputy Wright could not use that amount of force in those circumstances consistent with the Fourth Amendment.

II

Public officials are entitled to qualified immunity from civil damage suits insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817–19 (1982). And an order denying such immunity is generally appealable as a collateral order. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). A principal reason for such order's appealability is to protect such officials from the burdens of further pretrial proceedings and trial. *Id.* at 537 (O'Connor, J., concurring) ("The very purpose of [qualified immunity] is to protect the defendant from the burdens of trial, and the right will be irretrievably lost if its denial is not immediately appealable"); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) ("As an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial" (cleaned up)). But a court of appeals has jurisdiction only to the extent that qualified immunity "turns on an issue of law." *Mitchell*, 472 U.S. at 530.

6

When a district court addresses a motion for summary judgment claiming qualified immunity and concludes that disputed facts must be resolved to make that determination, it is not deciding qualified immunity as a matter of law but is, instead, finding that the motion cannot be granted because there are genuine disputes of material fact. *See* Fed. R. Civ. P. 56(a) (authorizing summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Thus, the Supreme Court has held that a district court's determination that material facts are in dispute is not appealable as a collateral order. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995) (holding that "a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency' . . . is not appealable" as it "was not a 'final decision'"). Accordingly, we have no jurisdiction over a district court's denial of a motion for summary judgment based on the ground that the record presents disputed material facts. *See Culosi*, 596 F.3d at 201.

On the other hand, even in such circumstances, we can review a denial of qualified immunity if the facts, taken most favorably to the plaintiff, show that the public official, as a matter of law, is nonetheless entitled to such immunity. *Williams*, 917 F.3d at 768; *see also Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc) ("[W]e possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them").

7

In this case, the district court did not adjudicate conclusively whether Deputy Wright was entitled to qualified immunity. Rather, it concluded, after a lengthy and careful analysis of the facts of record, that the motion for summary judgment had to be denied because disputes of material fact existed as to whether Deputy Wright used excessive force in violation of the Fourth Amendment. The court found disputes about several aspects of the encounter between Deputy Wright and Barricks, which, if resolved in Barricks's favor, would support his claim of excessive force. For instance, the court noted that there was a dispute as to whether Barricks posed a threat to Deputy Wright; whether Wright pushed Barricks to the ground with force after Barricks had surrendered; whether Wright used knuckles to strike Barricks's face; whether and to what extent Barricks resisted after hitting the ground; and whether parts of Barricks's body, other than his head, were readily available targets for Wright's "distraction strikes."

The district court's assessment of the record evidence is not a matter that we can review during this interlocutory appeal. This is because the Supreme Court has made clear that we may not review a district court's summary judgment order insofar as it determines whether or not the record sets forth a genuine issue of fact for trial. *See Johnson*, 515 U.S. at 313, 319–20; *see also Culosi*, 596 F.3d at 201.

Nonetheless, if we take the disputed facts as the district court viewed them in the light most favorable to Barricks and they support, as a matter of law, Deputy Wright's claim that he did not violate clearly established law, we have jurisdiction to grant him qualified immunity. *See Winfield*, 106 F.3d at 529 ("[W]e conclude that we possess jurisdiction to consider an appeal from a decision of a district court rejecting a government

8

official's claim of entitlement to qualified immunity to the extent that the official maintains that the official's conduct did not violate clearly established law"). And whether Deputy Wright is entitled to qualified immunity turns on whether, as matter of law, he violated the Fourth Amendment with excessive force and whether a reasonable officer in his position would have so known. *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (cleaned up)).

The Fourth Amendment protects against unreasonable seizures, including those made with excessive force. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Determining whether the use of force was reasonable or excessive requires consideration of the "circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The question [is] whether the totality of the circumstances justified a particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). Moreover, the reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the [benefit] of hindsight." *Graham*, 490 U.S. at 396. In making the reasonableness assessment, a court "must consider all the relevant circumstances, including facts and events leading up to the climactic moment." *Barnes v. Felix,* 605 U.S. 73, 76 (2025). Moreover, "even where an initial use of . . . force is reasonable, the repeated use of force

9

may be constitutionally excessive if circumstances change in a material way." *Harris v. Pittman*, 927 F.3d 266, 268–69 (4th Cir. 2019).

In this case, when viewing the disputed facts in the light most favorable to Barricks, Deputy Wright pushed Barricks to the ground and pressed his head into the cement floor after Barricks had surrendered by dropping to his knees and putting his hands behind his head. Deputy Wright then used his knuckles to strike Barricks twelve times in the head, even though he had surrendered, and, in any event, other parts of his body were available for "distraction strikes." And this force was applied in the context of non-violent misdemeanors — skateboarding on a public road and possible public intoxication. Moreover, the evidence taken in Barricks's favor also showed that there was no evidence that Barricks posed a threat to Deputy Wright with a weapon or otherwise. In short, the facts taken most favorably to Barricks would show that Deputy Wright applied gratuitous and injurious force after Barricks had surrendered and was no longer resisting.

With that version of the facts, the district court concluded that Barricks's constitutional rights would have been violated, identifying five cases demonstrating that the "law was clear that an officer could not use [the] amount of force [Deputy Wright used] to subdue a suspect on his knees and not resisting." *See Kane v. Hargis*, 987 F.2d 1005, 1006–08 (4th Cir. 1993) (per curiam) (affirming denial of qualified immunity on excessive force claim where, construing the facts in the light most favorable to the plaintiff, she attempted to flee a traffic stop while intoxicated and the defendant officer reacted by pinning her to the ground and then repeatedly pushing her face into the pavement, cracking her teeth); *Rowland v. Perry*, 41 F.3d 167, 172–74 (4th Cir. 1994) (affirming denial of

10

qualified immunity where disputed facts, if proved by the plaintiff, would have demonstrated that the plaintiff tried to free himself from the officer's grasp and the officer responded by punching him, throwing him to the ground, and using a wrestling maneuver to wrench the plaintiff's knee until it cracked and gave way); *Smith v. Ray*, 781 F.3d 95, 98, 102 (4th Cir. 2015) (affirming denial of qualified immunity where the record, viewed in the light most favorable to the plaintiff, showed that the officer threw a nonviolent female, who was, at most, suspected of a misdemeanor, to the ground, slammed his knee into her back, and wrenched her arm behind her); *Valladares v. Cordero*, 552 F.3d 384, 390–91 (4th Cir. 2009) (affirming denial of qualified immunity where the facts, viewed in the light most favorable to the plaintiff, indicated that an officer had twice slammed a subdued subject's head into a car, breaking his jaw); *Yates v. Terry*, 817 F.3d 877, 881, 887–88 (4th Cir. 2016) (affirming denial of qualified immunity where, on the plaintiff's facts, the officer deployed a taser against a nonviolent and compliant misdemeanant during a traffic stop).

In each of these cases identified by the district court, the court found that, on the plaintiffs' version of the facts, law enforcement officers had used excessive force against individuals who had stopped resisting, were attempting to flee, and/or were only "passively resisting, i.e. . . . not complying, but . . . also not attempting to fight back." With the possible exception of *Yates*, which involved the deployment of a taser, we agree that this collection of cases clearly establishes that Deputy Wright's use of force would be excessive if the facts taken most favorably to Barricks were established. *See Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (recognizing that for a law to be clearly established in the context of

11

qualified immunity, we do "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate"). And although there may be some factual distinctions with the case currently on appeal, these cases surely provide particularized examples of constitutional violations involving the use of excessive force "under similar circumstances" to those in the altercation between Barricks and Deputy Wright. *White*, 580 U.S. at 79. Accordingly, conducting the analysis based on the facts viewed in the light most favorable to Barricks leads to the conclusion that we cannot, at this juncture, conclude that Deputy Wright is entitled to qualified immunity.

In sum, while we have no jurisdiction to review whether the district court correctly assessed the facts and properly uncovered genuine disputes of material fact, we do have jurisdiction to review the district court's conclusion that the facts, when taken in the light most favorable to Barricks, show that Deputy Wright's conduct would have violated clearly established law and that he would not be entitled to qualified immunity. The disputed facts, therefore, must be resolved to reach a conclusion on immunity as a matter of law. Accordingly, we affirm the district court's order denying qualified immunity.

AFFIRMED